*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ROBERT CARL MAUE,

Defendant-Appellant.

UNPUBLISHED
February 1, 2024

No. 364081
Muskegon Circuit Court
LC No. 2019-003051-FH

Before: M. J. KELLY, P.J., and MARKEY and CAMERON, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial conviction of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(b) (sexual penetration accomplished through force or coercion). The trial court sentenced defendant to 68 months' to 15 years' imprisonment. On appeal, defendant argues that the trial court erred by admitting evidence under the excited-utterance exception to hearsay, MRE 803(2), and by assessing 10 points for Offense Variable (OV) 19, MCL 777.49(c), on the basis that defendant interfered with the administration of justice. We disagree on both accounts. Accordingly, we affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises out of a sexual assault involving cunnilingus committed by defendant against the victim, CJ, on June 2, 2019, when she was asleep in bed with her boyfriend, Nathaniel Maue, who is also defendant's son. The incident occurred when CJ and Nathaniel visited and stayed overnight at defendant's home. Present in defendant's house on the evening of June 1, 2019, were CJ, Nathaniel, defendant, and Kenneth Wilson, who is defendant's cousin and with whom defendant resided. CJ and defendant had never previously met. That evening and throughout the night, the four individuals consumed a large quantity of alcohol. CJ and Nathaniel finally went to bed at approximately 6:00 a.m. the following morning. The couple slept in defendant's bed while defendant slept nearby on a couch in the living room.

CJ testified that she awoke to the feeling of a person's tongue and finger touching the inside of her vagina. CJ initially believed that Nathaniel was performing oral sex on her, but, upon seeing

-1-

that he was sound asleep next to her, CJ began screaming. CJ observed defendant scurry and emerge from underneath the sheets at the end of the bed. She yelled at defendant as she got dressed. Wilson testified that he saw defendant walk toward the room where CJ and Nathaniel were sleeping and that he then heard CJ moaning and crying. According to Wilson, CJ sounded "deeply hurt." After CJ and Nathaniel left the house, Wilson asked defendant what happened, and defendant responded, "I was licking her p***sy and then she woke up. I don't understand what the problem is."

CJ and Nathaniel almost immediately exited defendant's home after the assault, driving away with CJ behind the wheel. CJ told Nathaniel that defendant had performed oral sex on her and that she had initially thought that it was Nathaniel. After driving a short distance, CJ stopped the car because she was crying so hard. She then punched the car, screamed, and ran off down the road. CJ soon diverted from the roadway and began walking along some nearby railroad tracks. She became so angry and upset about the sexual assault that she vomited. Nathaniel lost track of CJ after she left the car. He then called his mother, Michelle Hutchins, telling her that defendant had "raped" CJ, that CJ took off running down the road, and that he could not locate her. Nathaniel and his mother met, and they proceeded to drive in separate vehicles in the vicinity of the railroad tracks in an effort to find CJ. Hutchins found CJ a short time later near the tracks. The police were contacted about the assault, and CJ continued to cry and shake as she and Hutchins waited for the police to arrive.

Officers with the Muskegon County and Township Police Departments went directly to defendant's home, while Deputy Jason VanAndel responded to CJ's location near the railroad tracks. Deputy VanAndel interviewed CJ, and she described the sexual assault to him in great detail. The deputy testified that throughout the course of the interview, CJ was "very upset and hysterical," cried on and off, and was "[i]nconsolable at times." Over objection, Deputy VanAndel further testified with respect to the particular statements CJ made during the interview regarding the nature of the assault. The trial court allowed the testimony under the excited-utterance exception to the hearsay rule, MRE 803(2). CJ participated in a sexual assault examination later that day, and several specimens and samples were collected. An expert in forensic DNA analysis testified that there was very strong support for the conclusion that defendant contributed to the DNA found on CJ's vulvar swab sample.

Nathaniel left CJ and his mother by the railroad tracks before Deputy VanAndel arrived and drove to defendant's home to tell him that the police had become involved. The officers who went directly to defendant's home did so to conduct an investigation and to prevent a possible altercation between Nathaniel and his father. Defendant did not respond to the officers' commands to come out of the house, and they initially were unable to locate defendant inside the home when conducting a search of the house with a police canine. Wilson informed the police officers that defendant might be hiding in a crawl space, warning the officers that defendant owned several guns. The officers located the entrance of the crawl space hidden under a piece of plywood in a closet. They ordered defendant to exit the crawl space, but he failed to respond. One officer then leaned into the crawl space to peer inside, and he observed defendant lying face down. The officer directed defendant to show his hands, but defendant refused to comply or respond. The police made repeated unsuccessful demands for defendant to show his hands and exit the crawl space. Finally, defendant complied and surrendered when the police canine began barking at him.

The jury found defendant guilty of CSC-III. At sentencing, over defendant's objection, the trial court assessed 10 points for OV 19 and sentenced him to 68 months' to 15 years' imprisonment. The sentence was within the minimum sentence guidelines range. This appeal followed.

## II. HEARSAY TESTIMONY

Defendant first argues that the trial court abused its discretion by admitting CJ's out-of-court statements made to Deputy VanAndel regarding the sexual assault. Defendant contends that the testimony constituted hearsay and that the evidence did not support its admission under the excited-utterance exception to hearsay, MRE 803(2). We disagree.

Defendant objected to the deputy's testimony on hearsay grounds at trial; therefore, the issue was preserved. *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). We review a trial court's decision to admit evidence for an abuse of discretion. *Id*. at 251. "The decision to admit evidence . . . will not be disturbed unless that decision falls outside the range of principled outcomes. A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id*. at 251-252 (quotation marks and citations omitted). "Preliminary questions of law, including whether a rule of evidence precludes the admission of evidence, are reviewed de novo." *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013). A trial court's decision regarding whether a declarant was still experiencing the stress of a startling event for purposes of MRE 803(2) is given "wide discretion." *People v Smith*, 456 Mich 543, 552; 581 NW2d 654 (1998).

" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by a person as an assertion." MRE 801(a). Hearsay evidence is generally inadmissible unless it fits within an exception listed in the Michigan Rules of Evidence. See MRE 802. One such exception to the hearsay rule is an "excited utterance," which is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." MRE 803(2). A hearsay statement is admissible as an excited utterance if two requirements are met: "1) that there be a startling event, and 2) that the resulting statement be made while under the excitement caused by the event." *Smith*, 456 Mich at 550. The excited-utterance exception in MRE 803(2) "allows hearsay testimony that would otherwise be excluded because it is perceived that a person who is still under the sway of excitement precipitated by an external startling event will not have the reflective capacity essential for fabrication so that any utterance will be spontaneous and trustworthy." *Id.* (quotation marks omitted).

We disagree with defendant that CJ's statements made to Deputy VanAndel constituted inadmissible hearsay, and we conclude that the statements were admissible as excited utterances under MRE 803(2) because they were made shortly after CJ was sexually assaulted and while she was still under the excitement and trauma of the assault. First, CJ undoubtedly experienced a startling event when she was sexually assaulted. See *People v Straight*, 430 Mich 418, 425; 424 NW2d 257 (1988) ("Few could quarrel with the conclusion that a sexual assault is a startling event."). And defendant does not argue otherwise. Second, the record reflects that CJ was still under the stress or excitement of the assault when she made the statements to Deputy VanAndel. CJ testified that she was crying and screaming as she left her vehicle and that she had vomited

because of how disgusted and angry she felt about the assault. Hutchins testified that she found CJ shaking and crying at the railroad tracks and that CJ did not calm down as they waited for the police. Deputy VanAndel described CJ as hysterical, inconsolable, and crying intermittently throughout the interview. The deputy also testified that CJ appeared as if "something traumatic had happened to her." CJ's behavior and physical appearance evidenced the stress that she was experiencing when Deputy VanAndel arrived and interviewed her, minimizing the risk that CJ had the reflective capacity for fabrication when giving her statements. See *Smith*, 456 Mich at 550-552; *Straight*, 430 Mich at 425.

Defendant contends that CJ's statements to the deputy were inadmissible as excited utterances because CJ had enough time between the assault and reporting the assault to misrepresent what had actually transpired. "[I]t is the lack of capacity to fabricate, not the lack of time to fabricate, that is the focus of the excited utterance rule. The question is not strictly one of time, but of the possibility for conscious reflection." *Smith*, 456 Mich at 551. While no strict timing requirement exists for excited utterances, the passage of only approximately one to two hours between the sexual assault and CJ's statements was within reason given that the record clearly revealed that CJ remained under extreme emotional distress as a result of the assault up through her interview with Deputy VanAndel. See *id.* Physical factors such as shock can "prolong the period in which the risk of fabrication is reduced to an acceptable minimum," *id.* at 552 (quotation marks omitted), and CJ's conduct and anguished reactions suggested that she was in a state of shock at the time of her interview. In sum, we hold that the trial court did not abuse its discretion or otherwise err by admitting CJ's statements as excited utterances because the decision did not fall outside the range of principled outcomes and was consistent with the controlling caselaw. See *Thorpe*, 504 Mich at 252.[1]

Even were we to assume that error occurred, defendant has failed to establish that the admission of the statements resulted in a miscarriage of justice and was outcome-determinative. See MCL 769.26; *People v Williams*, 483 Mich 226, 243; 769 NW2d 605 (2009) ("[A] preserved, nonconstitutional error is not grounds for reversal unless, after an examination of the entire cause, it affirmatively appears that it is more probable than not that the error was outcome determinative."). CJ testified about the sexual assault and her actions immediately following the assault in great detail, and a sexual assault victim's testimony need not be corroborated by other evidence. See MCL 750.520h. Moreover, CJ's testimony regarding the sexual assault was consistent with the testimony provided by Nathaniel and Wilson, as well as the testimony by the sexual assault nurse examiner who performed CJ's sexual assault examination. Additionally, there was DNA evidence that supported a determination that defendant performed cunnilingus on CJ. Defendant has failed to establish that it is more probable than not that the outcome of his trial would have been different had CJ's statements made to Deputy VanAndel been excluded.

---

[1] Given that no error occurred, we reject defendant's cursory assertion that he was denied due process by the admission of CJ's statements. There was no due process violation for allowing the introduction of legally admissible evidence.

### III. SENTENCING

Defendant next argues that the trial court clearly erred by assessing 10 points for OV 19 and that the proper score entitles him to resentencing because it alters the minimum sentence guidelines range. We disagree.

Under the sentencing guidelines, the trial court's findings of fact are reviewed for clear error and must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013); *People v Rhodes (On Remand)*, 305 Mich App 85, 88; 849 NW2d 417 (2014). Clear error is present when the appellate court is left with a firm and definite conviction that an error occurred. *People v Fawaz*, 299 Mich App 55, 60; 829 NW2d 259 (2012). This Court reviews de novo "[w]hether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute . . . ." *Hardy*, 494 Mich at 438; see also *Rhodes*, 305 Mich App at 88. In scoring OVs, a court may consider all record evidence, including the contents of a presentence investigation report, plea admissions, and testimony presented at a preliminary examination. *People v Johnson*, 298 Mich App 128, 131; 826 NW2d 170 (2012). "The trial court may rely on reasonable inferences arising from the record evidence to sustain the scoring of an offense variable." *People v Earl*, 297 Mich App 104, 109; 822 NW2d 271 (2012), overruled in part on other grounds by *People v White*, 501 Mich 160, 164 n 2; 905 NW2d 228 (2017). "[D]ue process bars sentencing courts from finding by a preponderance of the evidence that a defendant engaged in conduct of which he was acquitted." *People v Beck*, 504 Mich 605, 629; 939 NW2d 213 (2019). When a preserved scoring error alters the appropriate guidelines range, resentencing is generally required. *People v Francisco*, 474 Mich 82, 89-92; 711 NW2d 44 (2006). This Court reviews de novo issues involving the interpretation of the sentencing guidelines. *People v Sours*, 315 Mich App 346, 348; 890 NW2d 401 (2016).

OV 19 concerns, in relevant part, "interference with the administration of justice." MCL 777.49. An offender must be assessed 10 points for OV 19 pursuant to MCL 777.49(c) if "[t]he offender . . . interfered with or attempted to interfere with the administration of justice[.]" An offender interferes with the administration of justice when he or she hampers, hinders, or obstructs the act or process of administering the judgment of individuals through the judicial process. *People v Baskerville*, 333 Mich App 276, 301; 963 NW2d 620 (2020). Conduct that occurred after the defendant completed the sentencing offense is considered when scoring OV 19. *People v Smith*, 488 Mich 193, 202; 793 NW2d 666 (2010). "OV 19 is generally scored for conduct that constitutes an attempt to avoid being caught and held accountable for the sentencing offense." *Sours*, 315 Mich App at 349. Actions that impede the process of investigating crime can amount to interference with the administration of justice. *Id*. at 349-350. "Hiding from the police constitute[s] an interference with the administration of justice because it [is] done for the purpose of hindering or hampering the police investigation." *People v Smith*, 318 Mich App 281, 286; 897 NW2d 743 (2016).

The record clearly and indisputably demonstrates that defendant attempted to avoid being caught. *Sours*, 315 Mich App at 349. He hid from the police, *Smith*, 318 Mich App at 286; when, knowing that the police would be arriving soon, he maneuvered himself into the crawl space of his house, which had a hidden entrance, remained prone on the ground, and ignored the officers' repeated demands and orders to come out and surrender. Under the caselaw construing MCL 777.49(c), defendant's actions constituted interference or attempted interference with the

administration of justice. We therefore hold that the trial court did not err by assessing 10 points for OV 19.

We affirm.

/s/ Michael J. Kelly
/s/ Jane E. Markey
/s/ Thomas C. Cameron